EXHIBIT 1

FLORIDA SUPREME COURT
TASK FORCE ON RESIDENTIAL MORTGAGE FORECLOSURE CASES

INTERIM REPORT

MAY 8, 2009

FLORIDA SUPREME COURT
TASK FORCE ON RESIDENTIAL MORTGAGE FORECLOSURE CASES

INTERIM REPORT

MAY 8, 2009

# CONTENTS

|  |  | PAGE |
|---|---|---|
| I. | Interim Report | |
| | A. Background | 1 |
| | B. Task Force Charge | 3 |
| | C. Meetings and Organizational Structure | 4 |
| | D. Work to Date | 5 |
| | E. Task Force Principles | 7 |
| | F. ADR Subcommittee Principles | 8 |
| | G. Case Management Subcommittee Principles | 9 |
| | H. Resolutions of the Task Force to Date | 9 |
| | I. Pending Issues Identified by the Task Force | 10 |
| | J. Next Steps and Immediate Plans | 11 |
| II. | Appendices | |
| | A. Statistics | |
| | B. Articles from The Florida Bar News | |
| | C. Surveys | |

On March 9, 2009, the Chief Justice established the Task Force on Residential Mortgage Foreclosure Cases by Administrative Order AOSC09-8. The Task Force was charged with submitting an interim report by May 8, 2009, and a final report by August 15, 2009. As chair of the Task Force, I respectfully submit this initial report in compliance with this charge.

## Background

- In three years, Florida's state courts have seen foreclosure filings increase from 74,000 cases in 2006 to 370,000 in 2008, an increase of 400 percent.[1]

- There has been no corresponding increase in court infrastructure to accommodate this caseload growth.

- In some circuits the increase in mortgage foreclosures is dramatically higher – the 20th circuit has seen a 788 percent caseload increase from 2006-2008 and the 12th circuit's caseload has increased 631 percent in the same time period. [2]

- National statistics from 2008 place Florida second in the country in residential mortgage foreclosure case filings according to Office of the Florida Governor Executive Order 08-27, section 1.01. Staff Report, *Foreclosure Activity Increases 81 percent in 2008, RealtyTrac (online article, Jan. 15, 2009).*

- The Supreme Court in <u>In Re: Amended Certification of the Need for Additional Judges</u>, 980 So. 2d 1040 (Fla. 2008), stated that "the number of

---

[1] SRS Data Reporting, Court Services, Office of the State Courts Administrator

[2] Based on information received from the Clerks of Court. Calendar years 2006, 2007 and January through June 2008 data were extracted from a static data base containing the official trial court statistics. July through December 2008 data were extracted from a dynamic data base and may be amended by the Clerks of Court. Office of the State Courts Administrator

1

mortgage foreclosures has increased by ninety-seven percent statewide over the last twelve months."

- Recent analysis by economists found: "Due to Florida's growing population and the significant increase in the number of Real Property/Mortgage Foreclosure cases filed, the court caseload throughout the state has grown dramatically and, as a result, has created growing and serious backlogs within the court system. This situation is adversely impacting the competitiveness of the State to create, retain, and expand jobs and private-sector enterprises."[3]

- "In total, the backlog of Real Property/Mortgage Foreclosure cases alone directly results in an estimated $9.9 billion of added costs and lost property values for Floridians each year. "[4]

- The Pew Center's Report's April 2008 report Defaulting on the Dream: States Respond to America's Foreclosure Crisis[5] projects that in Florida one out of 26 houses will go into foreclosure in 2008-2009, at a decrease in the average tax base/house value of approximately $36,000. In many circuits, declining property values are much steeper, a problem exacerbated by the increase in foreclosure filings and affecting all Floridians, whether they are in foreclosure or not.

- For example, in the 11th Circuit, Miami-Dade County, an average of 4664 foreclosures were filed monthly in 2008. In the first three months of 2009, while voluntary moratoria were in place by lenders, average monthly foreclosure filings increased to 6308, an increase of 35% during a moratorium. An average civil caseload in Miami-Dade County now hovers

---

[3] *The Economic Impacts of Delays in Civil Trials in Florida's State Courts Due to Under-Funding*, The Washington Economic Group February 9, 2009.

[4] *The Economic Impacts of Delays in Civil Trials in Florida's State Courts Due to Under-Funding*, The Washington Economic Group February 9, 2009.

[5] A joint project between Pew's Center on the States and Pew's Health and Human Services Programs. April 2008.

around 4500-5000 cases per judge, 2.7 times the standard caseload for a
circuit for certification purposes

- The problem is getting worse. The crisis started with subprime loans. In
  Florida, over 60% of subprime ARM's are at least one payment past due as
  of December 2008, according to the Mortgage Bankers' Association.[6]
  Alarmingly, according to the United States Office of Thrift Supervision,
  there was an increase of 115% of seriously delinquent **prime** mortgages
  from January to December 2008 with a significant rise occurring in the third
  to fourth quarters of the year.[7] According to the National Delinquency
  Survey from the Mortgage Banker's Association, 13.32 percent of the
  3,758,935 mortgage loans being serviced in Florida are either in foreclosure
  or seriously delinquent (more than three months in arrears).[8]

**Task Force Charge**

The Task Force on Residential Mortgage Foreclosure Cases was established to
recommend to the Supreme Court policies, procedures, strategies, and methods for
easing the backlog of pending residential mortgage foreclosure cases while
protecting the rights of parties. The Task Force was instructed that its
recommendations may include mediation and other alternate dispute resolution
strategies, case management techniques, and approaches to providing *pro bono* or
low-cost legal assistance to homeowners, and that the Task Force should examine
existing court rules and propose new rules or rule changes that will facilitate early,
equitable resolution of residential mortgage foreclosure cases.

---

[6] National Delinquency Survey, Fourth Quarter 2008, Special Summary Edition, Mortgage Banker's Association.

[7] Office of the Comptroller of the Currency, Office of Thrift Supervision, April 2009 OCC and OTS Mortgage Metrics Report.

[8] National Delinquency Survey, Fourth Quarter 2008, Special Summary Edition, Mortgage Banker's Association.

**Meetings and Organizational Structure**

The full Task Force has held four lengthy meetings by conference call (April 3, 15, 22, and May 8) and the full Task Force met in-person on April 27 for a full day meeting in Tampa.

In order to accomplish its charges, the Task Force divided into two subcommittees, Alternative Dispute Resolution (ADR) and Case Management. Judge Claudia Isom serves as chair of the Case Management subcommittee and Dr. Gregory Firestone serves as chair of ADR subcommittee. The purpose of the subcommittees is to gather and digest information from multiple sources and stakeholders in order to present recommendations to the full Task Force. The Task Force subcommittees are:

Case Management Subcommittee
        Judge Claudia Isom, chair
        Rosezetta Bobo
        Alan Bookman
        Arnell Bryant-Willis
        J. Thomas Cardwell
        Tammy Teston*

        Ms. Teston, deputy CFO replaced Alex Sink, CFO by amended administrative order

ADR Subcommittee
        Dr. Gregory Firestone, chair
        April Charney
        Judge Burton Conner
        Sandra Fascell Diamond
        Michael Fields
        Chief Judge Lee Haworth
        Perry Itkin
        Rebecca Storrow

Judge Jennifer Bailey, as chair, serves ex officio on both subcommittees and has participated in both subcommittees' work.

The subcommittees have also had regular communication via e-mail and met via conference call as follows:

| | |
|---|---|
| April 9: | Case Management subcommittee call |
| April 15: | ADR subcommittee call |
| April 21: | ADR subcommittee call |
| April 21: | Case Management subcommittee call |
| April 22: | ADR subcommittee call |
| May 1: | ADR subcommittee call |
| May 5: | Case Management subcommittee call |
| May 8: | ADR subcommittee call |

Conference calls and emails will continue to serve as the primary means of communication among members of the Task Force. We have used these media as effectively as possible to date. The Task Force respectfully requests permission to have one more live meeting before rendering its final report, which is needed to achieve full understanding and consensus of the issues before it.

**Work to Date**

The first month of the Task Force's work has been focused on gathering specific information about the scope of the problem and creating a set of working principles to guide our continuing work on answering the court's charge.

Information gathering function:

1. The Task Force gathered statistics from the Trial Court Administrators of the twenty judicial circuits of the state courts of Florida. (see, appendix A)

5

2. The task force announced its work in <u>The Florida Bar News</u> through articles and is openly soliciting suggestions and comments to <u>DRCMail@flcourts.org</u> (see, appendix B)

3. The task force designed on-line surveys for borrowers, lenders/servicers, and lawyers since public hearings are not possible for financial and timeline purposes. The borrower surveys were translated and posted in English, Spanish and Creole. The survey links are being sent out by email by task force members to as wide a circle of possible participants as possible, in hopes that the link will "go viral" and secure objective data as to the nature of specific problems in the foreclosure process. Those surveys went up during the last two weeks of April and first week of May 2009. (see, appendix C)

4. The task force is in the process of gathering information with regard to solutions from other jurisdictions. The Ohio Foreclosure Task Force Report has already been distributed, along with the HOPE task force final report from Governor Crist's office, the Washington Economics Group report on *The Economic Impacts of Delays in Civil Trials in Florida's State Courts Due to Under-Funding, and numerous articles on the Mortgage Foreclosure Crisis*. We are also in the process of assembling information from the Philadelphia foreclosure program.

5. The task force has received and reviewed the National Delinquency Survey from the Mortgage Bankers' Association with Fourth Quarter Data as of December 31, 2008; and the U.S. Office of the Controller of the Currency and the Office of Thrift Supervision's Mortgage Metrics Report for the Fourth Quarter of 2008. In addition, the task force has received the February 2008 Analysis of Subprime Mortgage Servicing Performance from the State Foreclosure Prevention Working Group, established by states attorneys general and state banking regulators.

6. The Task Force is gathering all forms in use in the circuits for analysis and comparison.

6

7.  The Task Force has gathered all current administrative orders on ADR programs in the twenty circuits, and will continue to gather orders as additional programs come online, as well as gathering performance data on the ADR programs that have been put in place.

8.  The Task Force has polled all the Trial Court administrators as to their list of the three most critical problems in connection with foreclosures.

9.  The Task Force has benefited from the assistance of OSCA staff members Sharon Press, Cal Goodlett, and Laura Rush in preparing a background information briefing on court and legislative efforts to address foreclosures; we anticipate an update on the memo with the conclusion of the current legislative session.

As a result of the information gathered, the Task Force has tentatively established basic principles upon which its work will go forward, both for the Task Force as a whole and for its subcommittees. It should be noted that they continue to be "works in progress" as the Task Force learns more about the issues and refines its work product.

## Task Force Principles

- We recognize and will not impair legal, equitable and constitutional rights which form the basis of foreclosure actions.

- We will strive to be consistent with existing statutes, rules, case law, and policies (or as amended).

- Our recommendations will be cost effective and affordable.

- We will promote and recommend public education on mortgage foreclosure issues.

7

- We will be responsive to the needs of various stakeholders in designing and implementing case management and ADR process.

- Our solutions will value uniformity and simplicity.

- Whatever we recommend will contain a program evaluation component to assess program effectiveness.

## ADR Subcommittee Principles

- Foreclosure ADR should promote the free and confidential exchange of information and avoid disclosure of information to parties not controlled by confidentiality.

- Foreclosure ADR should preserve mediation as a confidential process under the Mediation Confidentiality and Privilege Act.

- Foreclosure ADR should have consistent objective criteria for referral.

- The Task Force should consider a range of ADR methods.

- Our ultimate recommendation should include a process for approval of other forms of ADR as proposed by chief judges in order to explore innovation and best practices in this dynamic environment.

- Foreclosure ADR should invite all defendants to participate in the ADR process.

- Foreclosure ADR should provide that neutrals are specifically trained to serve as ADR foreclosure neutrals.

- Foreclosure ADR should provide participants with opportunity to become prepared to participate constructively in ADR.

- Our solutions should minimize the financial impact of ADR on the parties.

8

- Our solutions should be accessible to residential mortgage foreclosure ADR participants.

- Our solutions should utilize only Florida Supreme Court certified circuit mediators to mediate residential foreclosures.

- Our solutions should provide that the parties exchange essential information prior to mediation.

- We should establish a definition of what "Appearance at mediation" means, which is a work in progress.

## Case Management Subcommittee Principles

- The case management procedure should provide for the fair and efficient administration of justice while recognizing there may be socioeconomic issues implicated in foreclosure cases which are not directly in the court's jurisdiction.

- Our solution will design a durable differentiated case management system with established uniform forms, orders and rules to resolve foreclosure cases.

These principles, while a work in progress, have were adopted by consensus of the Task Force members.

**Resolutions of the Task Force to Date**

In addition to the principles adopted above, the Task Force has resolved issues as reflected below:

- The Task Force as a whole has voted to design an ADR program for foreclosures for consideration by the Court. There is a minority position that issues involving securitized mortgages will negatively impact the number of cases appropriate for mediation.

9

- The Task Force recognizes that the work of the courts is limited to the invocation of its jurisdiction. Therefore, it commends the exploration of pre-filing solutions, including pre-filing ADR, but will not consider or design pre-foreclosure filing solutions except as to consider potential impact on post-filing litigation. If the case is never filed, it is not part of the problem that the administrative order asks us to tackle.

- The Task Force is also in consensus, as reflected by the principles, that uniform solutions are needed across the state, in order to avoid a patchwork of independent and confusing requirements in these cases.

- There has been a clamor from those wishing to be appointed to the Task Force. The Task Force has responded that its membership was established by the Chief Justice by administrative order, and that it does not have the ability to add members. In addition, given the amount of work already accomplished, the Task Force has determined that it will not request additional members. However, the Task Force has aggressively requested those interested in participating to make sure to express their views at the email address of the task force, DRCmail@flcourts.org or at our regular mail address of: 500 S Duval Street Tallahassee, Florida 32399-1905

- Finally, the Task Force has determined that budgetary constraints, time constraints, and the directions of the administrative order prohibit the Task Force from holding open public hearings. We therefore continue to aggressively seek public input through the surveys, the email address and mail address. The CFO's office through Ms. Teston will assist in distributing the surveys as well as preparing media releases on our efforts to solicit public comment and opinion in connection with our charges.

**Pending Issues Identified by the Task Force**

- Lack of uniformity and complexity of current solutions across the state

- Lack of court infrastructure to handle the foreclosure case load as efficiently as justice might require. In the face of severe budget cuts, judicial branch workload has doubled and tripled in many jurisdictions without either additional judges or the support staff necessary to effectively case manage these cases, in addition, we are assessing available resources for ADR.

10

- Lack of single-stop reliable information sources on foreclosure efforts; lack of coordination among multiple workshops, public information efforts, counseling efforts; state, county and local government efforts

- Influx of pro se/unrepresented defendants in foreclosure cases

- Clarification of legal and ethical obligations of circuit judges in hearing uncontested securitized mortgage foreclosure cases as it would affect systems design by the Task Force

## Next Steps and Immediate Plans

- Meeting via conference call continues.

- The ADR subcommittee has begun considering the appropriateness of different ADR models and a hands-on consideration of the current approaches for ADR across the circuits, as well as gathering and evaluating options from other jurisdictions.

- The Case Management subcommittee is in the process of assembling and considering the various form orders and procedural administrative orders across the state, along with identifying specific "hot spots" where cases stall, break down, consume unnecessary judicial resources, or procedurally create subsequent problems later in the case.

- The surveys are up on the court website and are beginning what we hope is a wide distribution and a robust response.

- We are, through the CFO's office, ramping up our media releases on the surveys, our solicitation of suggestions and complaints, and we have enjoyed excellent coverage within The Florida Bar News.

11

- These survey results, suggestions, and analyses above will lead to the development of the draft procedures, policies, and rules which the Court charged us with recommending. We hope for a second live meeting in which to vet our recommendations face to face.

Respectfully submitted,

Judge Jennifer D. Bailey
Chair, Florida Supreme Court Task Force on Residential Mortgage Foreclosure Cases
May 8, 2009

12

APPENDIX A

# Real Property/Mortgage Foreclosure Filings

# Summary Reporting System
## Real Property/Mortgage Foreclosure Filings
### CY 2006 to CY 2008[1]

| Circuit | CY 2006 | CY 2007 | CY 2008 | Percent Increase CY 2006 to CY 2008 |
|---|---|---|---|---|
| 1 | 2,344 | 4,248 | 7,736 | 230% |
| 2 | 1,180 | 1,613 | 2,491 | 111% |
| 3 | 545 | 685 | 1,102 | 102% |
| 4 | 5,634 | 7,653 | 13,979 | 148% |
| 5 | 3,944 | 7,988 | 15,402 | 291% |
| 6 | 5,720 | 12,437 | 21,872 | 282% |
| 7 | 3,601 | 7,376 | 13,429 | 273% |
| 8 | 1,003 | 1,211 | 1,913 | 91% |
| 9 | 6,787 | 16,075 | 36,939 | 444% |
| 10 | 2,963 | 6,187 | 10,921 | 269% |
| 11 | 9,776 | 26,204 | 56,100 | 474% |
| 12 | 1,988 | 6,700 | 14,530 | 631% |
| 13 | 4,704 | 10,276 | 21,468 | 356% |
| 14 | 934 | 1,528 | 2,782 | 198% |
| 15 | 4,935 | 14,066 | 29,411 | 496% |
| 16 | 305 | 799 | 1,403 | 360% |
| 17 | 7,453 | 21,298 | 45,923 | 516% |
| 18 | 3,223 | 7,768 | 15,699 | 387% |
| 19 | 2,151 | 6,646 | 13,984 | 550% |
| 20 | 4,688 | 20,225 | 41,626 | 788% |
| **Statewide** | **73,878** | **180,983** | **368,710** | **399%** |

[1] These data are based on information received from the Clerks of Court. Calendar years 2006, 2007 and January through June 2008 data were extracted from a static data base containing the official trial court statistics. July through December 2008 data were extracted from a dynamic data base and may be amended by the Clerks of Court.

# Foreclosure Percent Change Map of Florida

# FORECLOSURE PERCENT CHANGE MAP OF FLORIDA
## Calendar Year 2006 to 2008



**First**
Escambia
Okaloosa
Santa Rosa
Walton

**Second**
Franklin
Gadsden
Jefferson
Leon
Liberty
Wakulla

**Third**
Columbia
Dixie
Hamilton
Lafayette
Madison
Suwannee
Taylor

**Fourth**
Clay
Duval
Nassau

**Fifth**
Citrus
Hernando
Lake
Marion
Sumter

**Sixth**
Pasco
Pinellas

**Seventh**
Flagler
Putnam
St. Johns
Volusia

**Eighth**
Alachua
Baker
Bradford
Gilchrist
Levy
Union

**Ninth**
Orange
Osceola

**Tenth**
Hardee
Highlands
Polk

**Eleventh**
Dade

**Twelfth**
Desoto
Manatee
Sarasota

**Thirteenth**
Hillsborough

**Fourteenth**
Bay
Calhoun
Gulf
Holmes
Jackson
Washington

**Fifteenth**
Palm Beach

**Sixteenth**
Monroe

**Seventeenth**
Broward

**Eighteenth**
Brevard
Seminole

**Nineteenth**
Indian River
Martin
Okeechobee
St. Lucie

**Twentieth**
Charlotte
Collier
Glades
Hendry
Lee

Under 100%

100%-300%

Over 300%

# Real/Property/Mortgage Foreclosure Filings
## By Size of Circuit



**Real Property/Mortgage Foreclosure Filings by Size of Circuit**

401% Increase

425% Increase

287% Increase

Filings

Calendar Year

Small (2nd,3rd,8th,14th,16th,19th)
Medium (1st,5th,7th,10th,12th,18th,20th)
Large (4th,6th,9th11th,13th,15th,17th)

*These data are based on information received from the Clerks of Court. Calendar years 2006, 2007 and January through June 2008 are official trial court statistics. July through December 2008 data may be amended by the Clerks of Court.

# Summary Reporting System
# Real Property/Mortgage Foreclosure
# Filings, Dispositions, and Reopenings

# Summary Reporting System
## Real Property/Mortgage Foreclosure
### Filings, Dispositions, and Reopenings
#### Fiscal Year 2005/06

| Circuit | Cases Filed | Cases Disposed | | | | | | | | Cases Reopened |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Dism Before Hearing | Dism After Hearing | Disposed by Default | Disposed by Judge | Non Jury Trial | Jury Trial | Other | Total | |
| 1 | 1,623 | 574 | 93 | 170 | 552 | 6 | 0 | 26 | 1,421 | 677 |
| 2 | 1,052 | 415 | 13 | 64 | 397 | 1 | 2 | 17 | 909 | 453 |
| 3 | 476 | 152 | 15 | 113 | 164 | 2 | 2 | 14 | 462 | 91 |
| 4 | 5,174 | 1,899 | 38 | 1,587 | 965 | 42 | 0 | 275 | 4,806 | 4,263 |
| 5 | 3,411 | 1,247 | 159 | 312 | 1,319 | 5 | 1 | 28 | 3,071 | 1,658 |
| 6 | 4,633 | 1,684 | 1,091 | 1,043 | 718 | 9 | 1 | 48 | 4,594 | 2,662 |
| 7 | 3,043 | 1,219 | 179 | 536 | 664 | 8 | 1 | 109 | 2,716 | 1,991 |
| 8 | 894 | 259 | 112 | 77 | 426 | 8 | 1 | 10 | 893 | 542 |
| 9 | 5,665 | 2,078 | 593 | 2,458 | 367 | 0 | 0 | 52 | 5,548 | 3,533 |
| 10 | 2,579 | 890 | 135 | 48 | 1,336 | 2 | 0 | 41 | 2,452 | 1,823 |
| 11 | 6,968 | 3,488 | 1,479 | 134 | 2,106 | 1 | 0 | 255 | 7,463 | 4,754 |
| 12 | 1,554 | 742 | 84 | 120 | 468 | 0 | 0 | 17 | 1,431 | 955 |
| 13 | 3,958 | 1,550 | 199 | 1,071 | 442 | 2 | 1 | 38 | 3,303 | 3,092 |
| 14 | 730 | 212 | 39 | 137 | 208 | 23 | 0 | 34 | 653 | 293 |
| 15 | 3,388 | 1,611 | 316 | 200 | 709 | 1 | 0 | 9 | 2,846 | 1,505 |
| 16 | 197 | 93 | 13 | 27 | 51 | 2 | 0 | 4 | 190 | 22 |
| 17 | 5,083 | 2,141 | 872 | 111 | 1,735 | 0 | 0 | 36 | 4,895 | 2,488 |
| 18 | 2,380 | 1,141 | 135 | 327 | 403 | 11 | 0 | 13 | 2,030 | 1,512 |
| 19 | 1,213 | 435 | 194 | 161 | 201 | 4 | 0 | 15 | 1,010 | 399 |
| 20 | 3,251 | 1,488 | 271 | 161 | 1,116 | 2 | 0 | 34 | 3,072 | 683 |
| Total | 57,272 | 23,318 | 6,030 | 8,857 | 14,347 | 129 | 9 | 1,075 | 53,765 | 33,396 |

Prepared by OSCA, Research and Data

## Summary Reporting System
### Real Property/Mortgage Foreclosure
### Filings, Dispositions, and Reopenings
#### Fiscal Year 2006/07

| Circuit | Cases Filed | Cases Disposed | | | | | | | | Cases Reopened |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Dism Before Hearing | Dism After Hearing | Disposed by Default | Disposed by Judge | Non Jury Trial | Jury Trial | Other | Total | |
| 1 | 3,190 | 857 | 73 | 250 | 924 | 6 | 1 | 42 | 2,153 | 737 |
| 2 | 1,361 | 460 | 12 | 76 | 456 | 2 | 2 | 29 | 1,037 | 508 |
| 3 | 619 | 176 | 28 | 116 | 156 | 4 | 0 | 10 | 490 | 103 |
| 4 | 6,505 | 1,838 | 100 | 1,570 | 887 | 77 | 0 | 283 | 4,755 | 2,984 |
| 5 | 5,176 | 1,326 | 240 | 457 | 1,437 | 8 | 0 | 40 | 3,508 | 1,457 |
| 6 | 8,225 | 1,744 | 762 | 1,528 | 1,269 | 6 | 0 | 39 | 5,348 | 2,206 |
| 7 | 4,961 | 1,311 | 176 | 649 | 1,044 | 15 | 0 | 131 | 3,326 | 1,623 |
| 8 | 1,105 | 345 | 87 | 85 | 401 | 34 | 0 | 12 | 964 | 347 |
| 9 | 9,920 | 2,314 | 494 | 2,688 | 646 | 0 | 0 | 99 | 6,241 | 2,847 |
| 10 | 4,055 | 1,062 | 116 | 74 | 1,579 | 3 | 1 | 44 | 2,879 | 1,449 |
| 11 | 16,656 | 4,200 | 1,427 | 86 | 4,948 | 0 | 4 | 135 | 10,800 | 5,410 |
| 12 | 3,353 | 676 | 80 | 271 | 860 | 3 | 1 | 48 | 1,939 | 844 |
| 13 | 6,582 | 1,968 | 180 | 1,284 | 620 | 2 | 1 | 48 | 4,103 | 2,363 |
| 14 | 1,226 | 281 | 49 | 246 | 266 | 12 | 0 | 40 | 894 | 290 |
| 15 | 8,414 | 1,847 | 337 | 377 | 1,281 | 6 | 0 | 11 | 3,859 | 1,411 |
| 16 | 532 | 104 | 19 | 11 | 134 | 0 | 0 | 7 | 275 | 26 |
| 17 | 12,685 | 2,998 | 808 | 95 | 3,966 | 10 | 3 | 61 | 7,941 | 2,889 |
| 18 | 4,925 | 1,109 | 132 | 636 | 624 | 6 | 2 | 34 | 2,543 | 1,315 |
| 19 | 3,621 | 634 | 158 | 681 | 515 | 6 | 0 | 9 | 2,003 | 568 |
| 20 | 9,729 | 1,596 | 252 | 171 | 2,168 | 14 | 1 | 128 | 4,330 | 1,041 |
| Total | 112,840 | 26,846 | 5,530 | 11,351 | 24,181 | 214 | 16 | 1,250 | 69,388 | 30,418 |

## Summary Reporting System
### Real Property/Mortgage Foreclosure
### Filings, Dispositions, and Reopenings

#### Fiscal Year 2007/08

| Circuit | Cases Filed | Cases Disposed | | | | | | | | Cases Reopened |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Dism Before Hearing | Dism After Hearing | Disposed by Default | Disposed by Judge | Non Jury Trial | Jury Trial | Other | Total | |
| 1 | 6,113 | 953 | 72 | 383 | 1,499 | 3 | 0 | 37 | 2,947 | 1,001 |
| 2 | 2,079 | 406 | 10 | 62 | 548 | 1 | 0 | 38 | 1,065 | 435 |
| 3 | 900 | 175 | 22 | 56 | 278 | 4 | 0 | 37 | 572 | 86 |
| 4 | 10,742 | 2,041 | 120 | 1,327 | 1,011 | 46 | 3 | 205 | 4,753 | 2,230 |
| 5 | 12,176 | 1,545 | 370 | 874 | 3,079 | 8 | 0 | 75 | 5,951 | 2,040 |
| 6 | 17,877 | 1,763 | 871 | 2,864 | 1,996 | 9 | 1 | 122 | 7,626 | 2,846 |
| 7 | 10,732 | 1,481 | 152 | 1,131 | 1,874 | 9 | 1 | 261 | 4,909 | 2,177 |
| 8 | 1,554 | 414 | 145 | 60 | 481 | 12 | 0 | 3 | 1,115 | 403 |
| 9 | 26,827 | 2,395 | 553 | 6,023 | 1,593 | 0 | 0 | 80 | 10,644 | 3,277 |
| 10 | 8,978 | 1,189 | 110 | 219 | 3,070 | 0 | 0 | 65 | 4,653 | 1,620 |
| 11 | 40,549 | 4,697 | 1,282 | 93 | 12,138 | 1 | 2 | 539 | 18,752 | 8,713 |
| 12 | 11,598 | 659 | 110 | 643 | 2,725 | 1 | 0 | 217 | 4,355 | 2,276 |
| 13 | 16,436 | 1,783 | 326 | 3,036 | 738 | 2 | 2 | 62 | 5,949 | 2,805 |
| 14 | 2,249 | 304 | 51 | 314 | 523 | 8 | 2 | 57 | 1,259 | 358 |
| 15 | 22,211 | 1,861 | 503 | 881 | 3,388 | 11 | 3 | 30 | 6,677 | 1,974 |
| 16 | 1,101 | 148 | 24 | 18 | 298 | 0 | 0 | 21 | 509 | 65 |
| 17 | 33,917 | 3,363 | 1,032 | 155 | 11,564 | 45 | 3 | 100 | 16,262 | 4,941 |
| 18 | 12,397 | 1,154 | 136 | 1,467 | 1,298 | 9 | 1 | 29 | 4,094 | 2,069 |
| 19 | 11,128 | 975 | 174 | 2,143 | 1,115 | 4 | 0 | 17 | 4,428 | 428 |
| 20 | 34,702 | 1,916 | 291 | 488 | 8,903 | 6 | 26 | 431 | 12,061 | 2,518 |
| Total | 284,266 | 29,222 | 6,354 | 22,237 | 58,119 | 179 | 44 | 2,426 | 118,581 | 42,262 |

APPENDIX B

Search:



The Florida Bar News
Advertising Rates • Classifieds • Attorneys Exchange • Archives • Subscribe • *Journal*
News HOME
April 30, 2009

# Foreclosure Task Force gets to work

## *Panel wants to hear from lawyers dealing with the issue*

By Mark D. Killian
*Managing Editor*

The Supreme Court Task Force on Residential Foreclosure Cases wants to hear from lawyers as it works to come up with recommendations to ease the backload of pending foreclosure cases while protecting the rights of parties.



"We really need constructive suggestions from the folks in the trenches dealing with these issues in the courthouses across the state of Florida," said 11th Circuit Judge Jennifer Bailey, who chairs the task force.

And the quicker the better. Created in March, the task force is charged with submitting an interim report in early May and the finished product by August 15.

Bailey said the task force is interested in receiving is interested in receiving comments on lawyers' experiences with foreclosure cases, including problems they have encountered, and any suggestions for uniform court rules, policies, and procedures to deal with foreclosures.

Comments can be sent immediately via e-mail to: DRCmail@flcourts.org or via regular mail to: Dispute Resolution Center, Supreme Court Building, Tallahassee, FL 32399-1905 or via fax to (850) 922-9290.

The task force also has developed online surveys from lenders, borrowers, and lawyers. They can be accessed www.flcourts.org

"What we are hoping is that these online surveys will assist us in capturing the nature and scope of the problem and any issues that we may have overlooked," Bailey said, noting that due to limited financial resourses, the task force currently has no public hearings set. The best way to become involved in the process in through electronic communication.

"We are loudly encouraging everyone to send us written comments because this is the opportunity for you to be heard," Bailey said. "It is important that everybody take advantage of this opportunity for input because, given the budget constraints, this is going to be the best

opportunity to participate in shaping the task force's recommendations to the court."

Bailey said the task force also has split into two subcommittees. One deals with alternative dispute resolution solutions and the other focuses on case management issues.

"Each subcommittee is working to develop a set of principles to guide the processes that we will consider," Bailey said. "In addition, each subcommittee is identifying a list of problems and issues that we are aware of."

Judge Bailey reiterated that "written comments will be essential for participation in this process."

News HOME
[Revised: 05-08-2009 ]

© 2005 The Florida Bar

Search:



The Florida Bar News
Advertising Rates • Classifieds • Attorneys Exchange • Archives • Subscribe • *Journal*
News HOME
April 1, 2009

# Supreme Court creates task force to study foreclosures

The Supreme Court has created a Task Force on Residential Mortgage Foreclosure Cases to recommend policies, procedures, strategies, and methods for easing the backlog of pending foreclosure cases while protecting the rights of parties.

Chief Justice Peggy Quince, in a March 9 administrative order, said the residential mortgage foreclosure crisis is of statewide proportions and should, to the extent possible, be addressed on a statewide basis with uniform rules, policies, and procedures to manage cases, protect the rights of homeowners and lenders, and to ease the burden on the courts. The chief justice asked the task force to submit an interim report and recommendations no later than May 8 and a final report no later than August 15.


"Our first step is identifying the problem and while we all think we know what the problem is, we need to hear from the people who are actually dealing with all this so we are not basing solutions on bad assumptions," said 11th Circuit Circuit Judge Jennifer Bailey, who will chair the task force.

Bailey said the task force is interested in receiving comments on lawyers' experiences with foreclosure cases, including problems they have encountered, and any suggestions for uniform court rules, policies, and procedures to deal with foreclosures.

Comments can be sent immediately via e-mail to: DRCmail@flcourts.org or via regular mail to: Dispute Resolution Center, Supreme Court Building, Tallahassee, FL 32399-1905 or via fax to (850) 922-9290.

Bailey said the task force is also now gathering all the circuit administrative orders dealing with foreclosures and has asked all Bar committees and sections with an interest in foreclosures to forward recommendations to the task force for consideration.

The panel also is developing an online survey "tailored to the various constituencies that will give folks on the ground the chance to tell us what they perceive the problems in mortgage foreclosure to be."

Mortgage foreclosure filings in Florida have increased by 396 percent from 2005-2006 to 2007-2008, resulting in a tremendous strain on limited judicial resources. In Miami-Dade County alone, 57,000 of the 81,000 civil cases filed last year were foreclosure actions.

Noting the tight deadline and lack of judicial resources, Bailey said the task force will meet mostly by conference call, but has set an in-person meeting for April 27 in Tampa to begin devising solutions.

"It's a quick turnaround, but a quick turnaround is required," Bailey said.

Other members of the task force include Rosezetta Bobo of Tallahassee; Alan Bookman of Pensacola; Arnell Bryant-Willis of Tallahassee; J. Thomas Cardwell of Orlando; April Charney of Jacksonville; Judge Burton Conner of Ft. Pierce; Sandra Fascell Diamond of Seminole; Michael M. Fields of Tallahassee; Gregory Firestone of Tampa; Chief Judge Lee A. Haworth of Sarasota; Judge Claudia Isom of Tampa; Perry S. Itkin of Ft. Lauderdale; Chief Financial Officer Alex Sink of Tallahassee; and Rebecca Storrow of West Palm Beach.

News HOME
[Revised: 05-08-2009 ]

© 2005 The Florida Bar

APPENDIX C

BORROWER SURVEY - ENGLISH

# Florida Supreme Court Task Force on Mortgage Foreclosures

In response to the mortgage foreclosure crisis in Florida, the Florida Supreme Court has formed the Task Force on Mortgage Foreclosures to recommend policies, procedures, strategies, and methods for easing the backlog of pending residential mortgage foreclosure cases while protecting the rights of parties. Our first task is to identify and describe the experiences of borrowers, lenders, and their attorneys in the foreclosure process. Please provide information about your experiences to the Task Force by completing the following survey. All responses are <u>anonymous</u> and will be reported only in the aggregate; no answers will be singled out or reported in any way that would allow identification of survey participants. Survey responses are public records, which must be disclosed upon request.

## Survey for Residential Real Estate Borrowers
### (only for those with current mortgages)

1. Please show the zip code for your residence (first 5 digits only): _____

2. Is this your homestead for property tax purposes? ____ Yes        ____ No

3. Do you know who your mortgage holder is? ____ Yes    ____ No

4. Has your mortgage been sold to another mortgage company?
     _____ Yes      _____ No      _____ Don't Know

5. Do you know who to contact about your mortgage and how to contact them?
     ____ Yes        ____ No

6. What is the current status of your mortgage loan? (check only one)
     ____ Current
     ____ Behind in payments – no foreclosure filed
     ____ Behind in payments – property is in foreclosure

7. Have you been served with a foreclosure suit regarding this mortgage?

    \_\_\_\_ Yes   \_\_\_\_ No

8. If you are behind on payments for your mortgage, have <u>you been contacted</u> by your mortgage holder?    \_\_\_\_ Yes    \_\_\_\_ No
(if no, please skip to question 9)

If yes:

    8a. When were you <u>first</u> contacted by your mortgage holder?

    \_\_\_\_\_ Payment one month past due

    \_\_\_\_\_ Payment two months past due

    \_\_\_\_\_ Payment three or more months past due

    \_\_\_\_\_ At the time of filing of foreclosure case

    8b. How many times has your mortgage holder contacted you? _____

    8c. In what ways have they reached you or attempted to reach you?
(check all that apply)

    \_\_\_\_ Telephone message/voicemail

    \_\_\_\_ US Mail

    \_\_\_\_ Email

    \_\_\_\_ "Live" call from mortgage holder's employee

    \_\_\_\_ Other (please describe): _____

    8d. Did you respond or reply to the attempted communication?

    \_\_\_\_ Yes    \_\_\_\_ No

    8e. How did you feel about your mortgage holder's communication with you?

    \_\_\_\_ Positive

    \_\_\_\_ Negative

    \_\_\_\_ Neutral

9. Have <u>you contacted</u> or attempted contact with your mortgage holder?
  \_\_\_\_ Yes    \_\_\_\_ No    (if no, please skip to question 10)

 **If yes:**
 9a. When did you <u>first</u> contact your mortgage holder?
 \_\_\_\_\_ My payment was one month past due
 \_\_\_\_\_ My payment was two months past due
 \_\_\_\_\_ My payment was three or more months past due
 \_\_\_\_\_ At the time of filing of foreclosure case

 9b. How many times have you contacted/attempted to contact your mortgage
   holder? _____

 9c. Were you successful in reaching your mortgage holder?
   \_\_\_\_ Yes    \_\_\_\_ No

 9d. In what ways did you reach them or attempt to reach them?
   (check all that apply)
   \_\_\_\_ Telephone message/voicemail
   \_\_\_\_ US Mail
   \_\_\_\_ Email
   \_\_\_\_ "Live" conversation with mortgage holder employee
   \_\_\_\_ Other (please describe): _____

 9e. How did you feel about your communication with your mortgage holder?
   \_\_\_\_ Positive
   \_\_\_\_ Negative
   \_\_\_\_ Neutral

10. Regardless of who contacted who, how would you describe your overall communication
  with your mortgage holder once contact was made? (please check one)
  \_\_\_\_ Positive (Helpful, reassuring, informative)
  \_\_\_\_ Negative (Frustrating, intimidating, confusing)

____ Neutral – neither positive nor negative

____ No communication with lender has occurred

11. Has your mortgage holder made you aware of the options available to you if you are struggling to make a mortgage payment? ____ Yes      ____ No
(if no, please skip to question 12)


If yes:

11a. Please check below to indicate the options your lender has told you about.
(check all that apply)

____ Talking to housing counseling agency  (getting information, assistance, and advice regarding your mortgage loan)

____ Forbearance agreement – (A forbearance **agreement** is typically an **agreement** to postpone, reduce, or suspend payment due on a loan for a limited and specific time period. Interest that accrues during the forbearance remains the debtor's responsibility.)

____ Adding missed payments to loan balance – (if you fall behind in your payments, you or the loan company can try to modify the mortgage by adding missed payments to your loan balance. Both parties must agree to such modifications.)

____ Changing interest rate (lowering the rate of interest charged for your mortgage loan and thereby lowering the monthly loan payment)

____ Extending mortgage – (extending the length of time the borrower has to repay the mortgage loan and thereby lowering monthly loan payments)

____ Repayment plan – (A repayment plan will take the delinquent amount and allow you to add a small amount to each mortgage payment until the delinquency is caught up.)

____ Changing an adjustable rate mortgage to a fixed rate mortgage so that the monthly payment amount remains constant

____ Reduction of the principal (the mortgage holder reduces the total amount due from the borrower for the mortgage, thereby reducing the monthly payment)

____ Lump sum payment – (a single payment, made in a lump sum, paid to reduce the principal balance due on your mortgage)

____ Managed transition or departure with dignity – the borrower does not have the money to make arrangements to stay in the house; the lender works with the borrower to assure a smooth exit from the house (may include considerations such as children's school year, keeping the house in good condition, delaying exit for a time to permit new housing to be found)

____ Partial claim – (an option offered by the FHA that allows a borrower, with help from a lender, to get an interest-free loan from HUD to bring their mortgage payments up to date)

____ Short sale – (a sale of real estate in which the proceeds from the sale of the property are less than the balance owed on a loan secured by the property sold)

____ Assumption of mortgage – (Agreement under which the buyer of a property takes over the seller's liability for payment of installments on the existing mortgage on the property, usually to save the closing costs or the higher interest rates of a new mortgage. The original seller of the property remains secondarily liable for payment of the mortgage unless released in writing by the lender.)

____ Deed-in-lieu of foreclosure – (When a home owner cannot make their mortgage payments, they offer the deed to the mortgage company to avoid going through foreclosure)

____ Other (please specify) _____

12. If you sent a proposal or requested a modification or approval for a short sale from your mortgage holder, how long did it take for the mortgage holder to make a decision and give you an answer?

____ One month

____ Two months

____ Three months

____ Four months or longer

____ Have never received an answer from the mortgage holder

____ Not Applicable – haven't requested modification/approval for short sale

13. Do you have an attorney representing you in this mortgage foreclosure case?

____ Yes      ____ No  (if no, please skip to question 14)

13a.  If yes, when did you hire your attorney? (select option closest to time of
      hiring)
      ____ At the time I learned of the foreclosure case
      ____ After the sale date was set

14.  Have you been contacted by or heard from an attorney representing your mortgage
     holder?        ____ Yes      ____ No

15.  Have you contacted or tried to contact the lawyer representing your mortgage
     holder?        ____ Yes      ____ No

16.  Which, if any, court-ordered programs related to a foreclosure case have you
     participated in?
         ____ Meeting with mortgage holder and neutral third party mediator in person
         ____ Conciliation conference with lender (by phone or in person) without a neutral
              person to assist with the conversation.

17.  If the court could create the opportunity for direct contact with your mortgage
     holder to work out options with no upfront expense to you, would you be willing to do
     so?      ____ Yes      ____ No

18.  Have any court hearings been held regarding your loan?      ____ Yes      ____ No
        (if no, please skip to question 19)

     If yes:
     18a.  How did the judge treat you during the hearing(s)?  (check one)
                  ____ Very fairly
                  ____ Fairly
                  ____ Neither fairly nor unfairly
                  ____ Unfairly
                  ____ Very unfairly

18b.  Were you given the opportunity to present or explain information regarding your case?

       \_\_\_\_\_ Yes         \_\_\_\_ No

18c.  Were you given the opportunity to ask questions?

       \_\_\_\_\_ Yes         \_\_\_\_\_ No

18d.  Did the judge treat you respectfully during the hearing?

       \_\_\_\_ Yes    \_\_\_\_ No

18e.  Did staff treat you with respect when you were in court (or the courthouse)?

       \_\_\_\_ Yes    \_\_\_\_ No

18f.  How did your mortgage holder's lawyer treat you during the hearing(s)? (check one)

       \_\_\_ Very fairly

       \_\_\_ Fairly

       \_\_\_ Neither fairly nor unfairly

       \_\_\_ Unfairly

       \_\_\_ Very unfairly

19.  Has the court entered any orders in your foreclosure case?

       \_\_\_ Yes    \_\_\_ No    \_\_\_ Don't know

20.  Are any loans or notes other than your primary mortgage also owed on your residence?       \_\_\_\_\_ Yes    \_\_\_\_\_ No   (if no, skip to Q. 21)

If yes:

20a. Please check all that apply:

       \_\_\_ Second mortgage

____ Home equity line-of-credit (HELOC)
____ Other

21. Is there more than one foreclosure case filed on this property?
    ____ Yes        ____ No

22. If applicable, are your condominium or homeowners' association dues currently paid up to date?
                _____ Yes      ____ No        ____ Not applicable

23. Are you currently living in a home that is in a foreclosure case?
    ____ Yes        ____ No

24. Do you owe more on your house than it is worth in the current real estate market?
    ____ Yes        ____ No

25. Did you buy this real estate as an investment property?      ____ Yes        ____ No

26. Have you have been in contact with the mortgage holder but they have been unable to give you a decision about your case? ____ Yes        ____ No

**Please check True or False for each of the following statements based on what you know/believe about the foreclosure process.**

27. ___ True ___ False    You will lose your home.
28. ___ True ___ False    You have a right to work with the mortgage holder to try to resolve the problem.
29. ___ True ___ False    You may be subject to a money judgment against you if the money from the court-ordered sale of your home is less than your loan amount.
30. ___ True ____ False    You may be entitled to receive money if the money from the court-ordered sale of your home is more than your loan amount.

31. ___ True ___ False     You have a right to file an answer (response) with the court about the foreclosure.

32. ___ True ___ False     Low-cost foreclosure counseling is available to help you try to resolve your foreclosure case.

33. ___ True ___ False     You understand what kind of work-outs might be available in your foreclosure case.

34. ___ True ___ False     You have to move out of your home as soon as the foreclosure case is filed.

35. ___ True ___ False     You have to move out of your home when you get a court order that says you have to leave.

36. ___ True ___ False     When your house is in foreclosure, you don't have to pay condominium or homeowner's fees.

37. ___ True ___ False     Once a foreclosure judgment is filed, you no longer own your house. It is the mortgage holder's responsibility.

Thank you for participating in this survey.

If you have additional comments or suggestions, please send your comments to:
The Mortgage Foreclosure Task Force at DRCmail@flcourts.org , or
c/o The Dispute Resolution Center, 500 S. Duval St., Tallahassee, FL  32399-1905

BORROWER SURVEY - SPANISH

## Grupo de Expertos en Ejecuciones Hipotecarias del Tribunal Supremo de la Florida

En respuesta a la crisis de las ejecuciones hipotecarias en la Florida, el Tribunal Supremo de la Florida ha organizado un Grupo de Expertos en Ejecuciones Hipotecarias para que recomiende políticas, procedimientos, estrategias y métodos para aliviar el retraso de los casos de ejecuciones hipotecarias residenciales pendientes, a la vez que se protegen los derechos de las partes involucradas. Nuestra primera tarea es identificar y describir la experiencia de los prestatarios, los prestamistas, y los abogados durante el proceso de ejecución hipotecaria. Por favor de proveer información sobre sus experiencias al Grupo de Expertos completando la siguiente encuesta. Todas las respuestas se mantendrán anónimas y se informarán solo en conjunto; ninguna de las respuestas se singularizará o se informará de manera que revele la identidad de los participantes en la encuesta. Las respuestas de la encuesta son documentos públicos, que hay que revelar si los piden.

### Encuesta para Prestatarios de Bienes Raíces Residenciales (Solo para aquellos que tienen hipotecas actualmente)

1. Por favor escriba el área postal de su residencia (los primeros 5 dígitos solamente): _____

2. ¿Es esta su vivienda primaria para asuntos de impuestos a la propiedad? _____ Sí_____No.

3. ¿Usted sabe quién es su acreedor hipotecario? ____Sí ____No

4. ¿Su hipoteca ha sido vendida a otra compañía?
_____ Sí _____No _____ No sé

5. ¿Sabe a quién llamar sobre su hipoteca y cómo ponerse en contacto con ellos?      \_\_\_\_Sí      \_\_\_\_No

6. ¿Cual es el estado actual de su préstamo hipotecario? (marque solo uno)
_____ Al día
_____ Pagos atrasados- ejecución hipotecaria sin presentar
_____ Pagos atrasados- propiedad en ejecución hipotecaria

7. ¿Le han entregado los documentos por la demanda del ejecución hipotecaria en relación a esta hipoteca?
\_\_\_\_Sí      \_\_\_\_No

8. Si usted tiene pagos hipotecarios atrasados, ¿se ha puesto en contacto con usted el acreedor hipotecario?
\_\_\_\_Sí      \_\_\_\_No
(Si la respuesta es no, por favor pase a la pregunta 9)

**Si la respuesta es sí:**
    8a . ¿Cuándo lo contactó el acreedor hipotecario por primera vez?
    \_\_\_ El pago tenía un mes de retraso
    \_\_\_ El pago tenía dos meses de retraso
    \_\_\_ El pago tenía tres o más meses de retraso
    \_\_\_ El día que se presentó el caso de ejecución hipotecaria

    8b. ¿Cuántas veces su acreedor hipotecario se ha puesto en contacto con usted?_____

    8c. ¿Cómo lo contactaron o trataron de hacerlo?
        (Marque todos los que apliquen)
        \_\_\_ Mensaje telefónico/correo telefónico
        \_\_\_ Correo postal

_____ Correo electrónico
_____ Llamada "en vivo" de un empleado del acreedor
hipotecario
_____ Otro (describa por favor):_____

8d. ¿Usted contestó el intento de comunicación del
acreedor hipotecario?
          _____Sí      _____No

8e. ¿Cómo se sintió usted en cuanto a la comunicación
del acreedor hipotecario con usted?
          _____ Positivo
          _____ Negativo
          _____ Neutral

9. ¿Se ha puesto <u>usted en contacto</u>, o ha tratado de hacerlo, con
su acreedor hipotecario?
          _____Sí      _____No      (Si la respuesta es no, por favor pase
a la pregunta 10)

     **Si la respuesta es sí:**
     9a. ¿Cuándo contactó usted al acreedor hipotecario por
     <u>primera</u> vez?
     _____ Mi pago tenía un mes de retraso
     _____ Mi pago tenía dos meses de retraso
     _____ Mi pago tenía tres meses o más de retraso
     _____ Cuando se presentó el caso de ejecución hipotecaria

     9b. ¿Cuántas veces se ha puesto usted en contacto, o ha
     tratado de hacerlo, con su acreedor hipotecario? _____

     9c. ¿Logró ponerse en contacto con su acreedor hipotecario?
          _____Sí      _____No

9d. ¿De qué manera trató usted de contactarlo?
     (Marque todas las que apliquen)
     \_\_\_ Mensaje telefónico/correo telefónico
     \_\_\_ Correo postal
     \_\_\_ Correo electrónico
     \_\_\_ Llamada "en vivo" de un empleado del acreedor
     hipotecario
     \_\_\_ Otro (describa por favor):_____

9e. ¿Cómo se sintió usted en cuanto a la comunicación
con su acreedor hipotecario? (Marque una)
     \_\_\_ Positivo
     \_\_\_ Negativo
     \_\_\_ Neutral

10. Independientemente de quién llamo a quién, ¿cómo describiría
usted en general la comunicación sostenida con su acreedor
hipotecario una vez que hubo contacto? (Marque una)
     \_\_\_ Positivo (fue de ayuda, tranquilizante, informativa)
     \_\_\_ Negativo (frustrante, intimidante, confusa)
     \_\_\_ Neutral (ni positiva ni negativa)
     \_\_\_ No ha habido comunicación alguna con el prestamista

11. ¿Le ha informado su acreedor hipotecario las opciones que
tiene usted disponible si está luchando por pagar la hipoteca?
     \_\_\_\_Sí    \_\_\_\_No
(Si la respuesta es no, por favor pase a la pregunta 12)

**Si la respuesta es sí:**
11a. Por favor indique a continuación las opciones que su
prestamista le ha informado.
     (Marque todas las que apliquen)

____ Hablar con una agencia de consejería residencial (obtener información, ayuda y consejo sobre su préstamo hipotecario)

____ Acuerdo de tolerancia- (típicamente, un **acuerdo** de tolerancia es un **acuerdo** para posponer, reducir, o suspender el pago de un préstamo por un período limitado y específico de tiempo. El interés que se acumula durante el período de tolerancia es responsabilidad del deudor).

____ Añadirle los pagos incumplidos al balance del préstamo — (si usted se retrasa en sus pagos, usted o la compañía de préstamos puede tratar de modificar la hipoteca añadiéndole los pagos incumplidos al balance de su préstamo. Ambas partes tienen que estar de acuerdo con las modificaciones).

____ Cambiar la tasa de interés (bajar la tasa de interés de su préstamo hipotecario, bajando así el pago mensual de éste)

____ Extensión hipotecaria— (extender el tiempo que el prestatario tiene para pagar el préstamo hipotecario y bajar así el pago mensual del préstamo)

____ Plan de pago— (Un plan de pago toma la cantidad de pagos incumplidos y le permite  añadirle una suma pequeña a cada pago de la hipoteca hasta que salde la cantidad delincuente)

____ Cambiar la tasa de interés ajustable a una tasa de interés fija para que la cantidad del pago mensual permanezca constante.

____ Reducción del principal— (el acreedor hipotecario reduce la cantidad total que debe el prestatario por la hipoteca, reduciendo así el pago mensual)

____ Pago global – (un pago único, hecho en una suma global, pagada para reducir el balance del principal que se debe en su hipoteca)

____ Transición administrada o salida con dignidad—el prestatario no tiene dinero para hacer arreglos y quedarse en la casa; el prestamista trabaja con el prestatario para asegurar que haya una desocupación ordenada de la casa (puede incluir tomar en consideración asuntos como el año escolar de los niños, mantener la casa en buenas condiciones, retrasar la desocupación temporalmente para que encuentren otra casa)

____ Reclamo parcial— (opción ofrecida por la FHA que le permite al prestatario, con ayuda del prestamista,  obtener un préstamo del HUD sin cobro de intereses para poner al día los pagos hipotecarios)

____ Venta en descubierto-- (venta de bienes raíces en la cual el producto de la venta de la propiedad es menor que el balance de la deuda de un préstamo asegurado por la propiedad vendida)

____ Asunción hipotecaria -- (acuerdo bajo el cual el comprador de una propiedad asume la responsabilidad del vendedor sobre los pagos a plazos de la hipoteca existente, generalmente para ahorrar los gastos de cierre o las tasas de interés más altas de la nueva hipoteca. El vendedor original de la propiedad sigue siendo responsable secundariamente del pago de la hipoteca a menos que el prestamista lo libere por escrito)

____ Título-en lugar-de –ejecución hipotecaria – (Cuando un propietario no puede cumplir los pagos hipotecarios le ofrece el título a la compañía hipotecaria para evitar pasar por una ejecución hipotecaria)

____ Otro (por favor especifique) _____

12. Si usted le envió a  su acreedor hipotecario una propuesta o solicitó una modificación o aprobación de una venta en

descubierto, ¿cuánto tiempo le tomó a su acreedor hipotecario tomar una decisión y responderle?

_____ Un mes

_____ Dos meses

_____ Tres meses

_____ Cuatro meses o más

_____ Nunca ha recibido contestación del acreedor hipotecario

_____ No aplica — no ha solicitado modificación/aprobación de venta al descubierto

13.  ¿Tiene usted un abogado que le esté representando en este caso de ejecución hipotecaria?   _____Sí   _____No

   (Si la respuesta es no, pase a la pregunta 14)

   13a. Si lo tiene, ¿cuándo contrató al abogado? (Seleccione la opción más cercana a la fecha)

   _____ Cuando me enteré del caso de la ejecución hipotecaria

   _____ Después que se puso fecha de venta

14. ¿Se ha puesto en contacto con usted algún abogado que represente a su acreedor hipotecario?

_____Sí   _____No

15. ¿Se ha puesto usted en contacto con o  ha tratado de contactar al abogado que representa a su acreedor hipotecario?

_____Sí   _____No

16. ¿En cuál programa ordenado por el tribunal relacionado con el caso de ejecución hipotecara ha participado usted, si es que lo ha hecho en alguno?

_____ Reunión en persona con el acreedor hipotecario y un mediador neutral como tercera parte.

_____ Conferencia conciliatoria con el prestamista (por teléfono o en persona) sin una persona neutral que ayude en la conversación.

17. Si el tribunal pudiera crear la oportunidad de tener contacto directo con su acreedor hipotecario para elaborar opciones sin costo para usted, ¿estaría usted dispuesto a hacerlo?
_____ Sí      _____ No

18. ¿Ha habido alguna audiencia sobre su préstamo?
_____ Sí      _____ No
    (Si la respuesta es no, pase a la pregunta 19)

    **Si la respuesta es sí:**
    18a. ¿Cómo lo trató el juez durante la (s) audiencia (s)? (marque uno)
        _____ Muy justo
        _____ Justo
        _____ Ni justo ni injusto
        _____ Injusto
        _____ Muy injusto

    18.b. ¿Se le dio la oportunidad de presentar información o explicar su caso?      _____ Sí      _____ No

    18c. ¿Se le dio la oportunidad de hacer preguntas?
    _____ Sí      _____ No

    18d. ¿Le trató el juez respetuosamente durante la audiencia? _____ Sí      _____ No

    18e. ¿Le trataron respetuosamente los empleados cuando estaba en la sala del tribunal (o en el edificio del tribunal)?
    _____ Sí      _____ No

18f. ¿Cómo le trató el abogado de su acreedor hipotecario durante la(s) audiencia(s)?  (Marque una)

\_\_\_\_ Muy justo

\_\_\_\_ Justo

\_\_\_\_ Ni justo ni injusto

\_\_\_\_ Injusto

\_\_\_\_ Muy injusto

19. ¿Ha emitido el/la juez órdenes en su caso de ejecución hipotecaria?

\_\_\_Sí      \_\_\_No     \_\_\_No sé

20. ¿Se debe en su residencia cualquier otro préstamo o pagarés además de su hipoteca primaria? \_\_\_Sí      \_\_\_No.
(Si la respuesta es no, pase a la pregunta 21)

**Si la respuesta es sí:**

20a. Por favor indique todas las que apliquen:

\_\_\_\_ Segunda hipoteca

\_\_\_Línea de crédito sobre la plusvalía, el patrimonio neto (HELOC, siglas en inglés)

\_\_\_\_ Otra

21. ¿Hay más de un caso de ejecución hipotecaria presentado contra esta propiedad?      \_\_\_Sí      \_\_\_No

22. Si aplica, ¿está al día en el pago de las cuotas de su asociación de condominio o propietarios?

\_\_\_Sí      \_\_\_No      \_\_\_No aplica

23. ¿Está viviendo usted en una residencia que está en ejecución hipotecaria?      \_\_\_Sí      \_\_\_No

24. ¿Debe usted más en su casa de lo que ésta vale en el mercado actual de bienes raíces?    ____Sí    ____No

25. ¿Compró usted esta propiedad como una inversión?
____Sí    ____No

26. ¿Ha estado usted en contacto con el acreedor hipotecario pero ellos no han podido darle una decisión sobre su caso?
____Sí    ____No

**Por favor indique Cierto o Falso en las siguientes declaraciones basándose en lo usted sabe o cree sobre el proceso de ejecución hipotecaria.**

27. ___ Cierto    ____ Falso    Usted perderá su casa.

28. ___ Cierto    ____Falso    Usted tiene el derecho de trabajar con su acreedor hipotecario para tratar de resolver el problema.

29. ___Cierto    ____Falso    Usted pudiera ser sujeto a un fallo monetario en su contra si el dinero de la venta de su casa ordenada por el tribunal es menor que la cantidad del préstamo.

30. ___Cierto    ____Falso    Usted pudiera tener derecho a recibir dinero si el dinero de la venta de su casa ordenada por el tribunal es mayor que la cantidad del préstamo.

31. ___Cierto    ____Falso    Usted tiene el derecho de presentar una contestación (responder) ante el tribunal sobre la ejecución hipotecaria.

32. ____ Cierto ____Falso        Existe consejería a bajo costo sobre la ejecución hipotecaria para que usted trate de resolver su caso.

33. ____Cierto ____Falso        Usted entiende qué tipos de arreglos pudieran estar disponibles en su caso de ejecución hipotecaria.

34. ____Cierto    ____Falso        Usted tiene que mudarse  tan pronto se presente ante el tribunal el caso de ejecución hipotecaria.

35. __Cierto    ____Falso        Usted tiene que mudarse tan pronto como reciba una orden judicial que diga que tiene que mudarse.

36. ____Cierto    ____Falso        Cuando su casa está en ejecución hipotecaria usted no tiene que pagar sus cuotas de la asociación de condominio o de propietarios.

37. ____Cierto    ____Falso        Una vez que se emite el fallo de ejecución hipotecaria, ya usted no es dueño de su casa. Es responsabilidad del acreedor hipotecario.

Gracias por participar en esta encuesta

Si tiene comentarios o sugerencias adicionales, por favor remítalos a el grupo de expertos en ejecuciones hipotecarias: DRCmail@flcourts.org; o
The Mortgage Foreclosure Task Force
c/o The Dispute Resolution Center
500 S. Duval St.
Tallahassee, Fl 32399-1905

BORROWER SURVEY - CREOLE

# Komite Spesyal Lakou Siprèm Florid la sou Sezi Ipotekè

Pou reponn a kriz sezi ipotekè lan Florid la, Lakou Siprèm Florid la fòme yon komite spesyal sou Sezi Ipotekè pou rekòmande règleman, pwosedi, strateji ak metòd pou redui reta lan rès pwopriyete rezidansyèl y ap sezi yo e pwoteje dwa pati yo. Premye obligasyon nou se idantifye e dekri eksperyans moun ki pran prè yo, moun ki bay prè yo e eksperyans avoka yo sou zafè sezi ipotekè. Silvouplè bay Komite Spesyal la enfòmasyon sou eksperyans ou lè w ap ranpli ankèt sa a. Tout repons yo ap <u>anonym</u> e ya va rapòte yo sèlman lan konpilasyon final la; yo pa pral note oubyen rapòte okenn repons lan okenn fason ki ta pèmèt ke yo idantifye patisipan lan ankèt la. Repons lan ankèt sa a fè pati de achiv piblik, e yo dwe revele dosye sa a alademann.

## Ankèt pou Moun Ki Pran Prè Sou Pwopriyete Rezidansyèl
### (sèlman pou moun ki aktyèlman gen ipotèk)

1.  Silvouplè bay kòd postal rezidans ou (5 premye chif yo sèlman): _____

2.  Èske se rezidans prensipal ou pou afè enpo lokatif? ____ Wi ____ Non

3.  Èske ou konnen non konpayi ipotèk ou an? ____ Wi        ____ Non

4.  Èske yo vann ipotèk ou an bay yon lòt konpayi ipotekè?
       _____ Wi        _____ Non        _____ M Pa Konnen

5.  Èske ou konnen kimoun pou w kontakte pou ipotèk ou an e kijan pou w kontakte yo?
       ____ Wi        ____ Non

6.  Lan ki sitiyasyon aktyèl prè ipotekè w la ye? (tyeke sèlman youn)
       ____ Ajou
       ____ Anreta sou peman – yo poko sezi pwopriyete a
       ____ Anreta sou peman – y ap sezi pwopriyete a

7.  Èske yo remèt ou lamen nan lamen papye pou pwosè sezi ipotekè konsènan ipotèk sa a?

___ Wi   ___ Non

8.  Si w anreta sou peman w pou ipotèk ou an, èske konpayi ipotèk la <u>te kontakte w</u>?
   ___ Wi        ___ Non
   (si se non, silvouplè ale lan kesyon 9)

   **Si se wi:**
   8a.  Ki <u>premye</u> fwa konpayi ipotèk la te kontakte w?
   _____ Peman an te gen yon mwa anreta
   _____ Peman an te gen de mwa anreta
   _____ Peman an te gen twa mwa oswa plis tan anreta
   _____ Lè yo depoze dokiman sezi ipotekè pou ka sa a

   8b.  Konbyen fwa konpayi ipotèk ou an te kontakte w? _____

   8c.  Pa ki mwayen yo te kontakte w oubyen kijan yo te eseye kontakte w?
      (tyeke tout sa ki aplikab)
      ___ Mesaj lan telefòn/mesaj vokal
      ___ Lapòs Lèzetazini
      ___ I Mel
      ___" Anplwaye konpayi ipotèk la rele w "Pèsonèlman
      ___ Lòt jan (silvouplè dekri): _____

   8d.  Èske ou te reyaji oubyen ou te bay repons lè yo te eseye kontakte w la?
      ___ Wi        ___ Non

   8e.  Sa w te panse osijède kominikasyon ou te genyen ak konpayi ipotèk la?
      ___ Pozitif
      ___ Negatif
      ___ Ni pozitif ni negatif

9.  Èske <u>ou te kontakte</u> oswa eseye kontakte konpayi ipotèk ou an?

\_\_\_\_ Wi       \_\_\_\_ Non       (Si se non, silvouplè ale lan kesyon 10)

**Si se wi:**

9a.  Ki <u>premye</u> fwa ou te kontakte konpayi ipotèk la?

\_\_\_\_\_ Peman an te gen yon mwa reta

\_\_\_\_\_ Peman an te gen de mwa reta

\_\_\_\_\_ Peman an te gen twa mwa ou plis reta

\_\_\_\_\_ Lè yo depoze dokiman sezi ipotekè pou ka sa a

9b.  Konbyen fwa ou te kontakte oubyen ou te eseye kontakte konpayi ipotèk ou an?

_____

9c.  Èske ou te reyisi kontakte konpayi ipotèk ou an?

\_\_\_\_ Wi       \_\_\_\_ Non

9d.  Pa ki mwayen ou te kontakte oubyen ou te eseye kontakte konpayi an?
     (tyeke tout sa ki aplikab)

\_\_\_\_ Mesaj lan telefòn/mesaj vokal

\_\_\_\_ Lapòs Lèzetazini

\_\_\_\_ I Mel

\_\_\_\_ Anplwaye konpayi ipotèk la rele ou "Pèsonèlman"

\_\_\_\_ Lòt jan (silvouplè dekri): _____

9e.  Sa w te panse osijède kominikasyon ou te genyen ak konpayi ipotèk la?

\_\_\_\_ Pozitif

\_\_\_\_ Negatif

\_\_\_\_ Ni pozitif ni negatif

10.  Ke se oumenm oswa konpayi a ki inisye kontak la, kijan ou ta dekri kominikasyon jeneral ou te genyen ak konpayi ipotèk ou an lè kontak la te fèt? (silvouplè tyeke youn)

\_\_\_\_ Pozitif (Sa te ede m, rasire m, sa te ban m enfòmasyon)

\_\_\_\_ Negatif (Sa te dekouraje m, entimide m, twouble m)

\_\_\_\_ Ni pozitif ni negatif

_____ Pa t gen ankenn kominikasyon ki te fèt ak moun ki bay prè a

11.  Èske konpayi ipotèk la te mete w okouran de opsyon ki disponib pou ou si w gen difilkite pou w peye ipotèk la?        _____ Wi        _____ Non
(si se non, silvouplè ale lan kesyon 12)

Si wi:

11a. Silvouplè tyeke anba a pou endike ki sòt de opsyon moun ki ba w prè a te pale avè w.

                        (tyeke tout sa ki aplikab)

_____ Pale ak yon ajans ki bay konsèy sou zafè lojman  (pou w pran enfòmasyon, èd e konsèy sou prè ipotekè w la)

_____ Aranjman pou delè de gras – (yon **aranjman** pou delè de gras, jeneralman se yon **aranjman** pou yo ranvwaye, redui, oswa sispann peman ke moun dwe sou yon prè pandan yon peryòd de tan limite e spesifik. Se moun ki dwe lajan an ki responsab pou peye enterè ki akimile pandan peryòd delè de gras la.)

_____ Ajoute peman k manke yo sou rès ipotèk la – (si ou anreta sou peman yo, oumenmn oswa konpayi ki bay prè a ka eseye ajoute peman ke w rate yo sou rès lajan prè a pou modifye ipotèk la. Toulède pati yo dwe dakò pou modifikasyon sa yo fèt.)

_____ Chanje to enterè a (sa vle di bese to enterè ke yo fè w peye sou prè ipotekè w la, konsa peman mansyèl sou prè w yo ap bese tou)

_____ Pwolonje ipotèk la – (bay moun ki pran prè a plis tan pou l peye prè ipotekè a, e konsa peman mansyèl sou prè li yo ap bese tou)

_____ Plan pou ranbousman – (lan yon plan ranbousman, yap pran montan aryere e yap otorize w ajoute yon ti kantite lajan sou chak peman ke w fè pou ipotèk la jiskaske ou ajou.)

_____ Chanje yon to ipotèk varyab pou yon to ipotekè fiks defasonke montan peman mansyèl la rete konstan

_____ Redui kapital la (konpayi ipotèk la  redui montan total ke moun ki prete lajan an dwe pou ipotèk la, kidonk li redui peman mansyèl la)

_____ Peman yon Montan Global – (se yon sèl peman, ki fèt pou yon montan global, ke yo peye pou redui rès kapital ke ou dwe sou ipotèk ou)

_____ Tranzisyon Kontwole oswa soti lan kay la ak diyite – moun ki pran prè a pa gen lajan pou l fè aranjman pou l rete lan kay la; moun ki bay prè a diskite avèk

moun ki dwe lajan an pou asire ke l sot lan kay la san bri san kont (yo ka pran an konsiderasyon sèten bagay, tankou epòk lekòl timoun yo, kenbe kay la an bòn kondisyon, bay moun lan ase tan pou l soti lan kay la, pou li ka jwenn yon nouvo lojman)

____ Reklamasyon pasyèl – (se yon opsyon ke FHA ofri ki pèmèt moun ki pran prè a avèk èd moun ki bay prè a jwenn yon prè san enterè lan men HUD pou mete peman ipotèk yo ajou)

____ Vant a pèrt – (se yon vant yon pwopriyete kote montan lajan ki sot lan vant pwopriyete a pi piti ke rès lajan moun lan dwe sou prè ke l te pran sou pwopriyete ke li vann lan)

____ Transfè ipotekè – (Aranjman kote moun k ap achte pwopriyete a pran responsabilite vèsman pou peman ipotèk aktyèl kay la lan men vandè a, abityèlman pou li ka ekonomize frè pou klotire afè a oswa pou evite yon to enterè pi elve avèk yon nouvo ipotèk. Premye vandè pwopriyete a rete pasyèlman responsab peman ipotèk la amwenske moun ki bay prè a ba l dechaj alekri.)

____ Transfere tit olyede sezi ipotekè – (Lè pwopriyetè kay la yo pa kabap peye ipotèk la, yo ofri tit la bay konpayi ipotèk la pou evite sezi ipotekè a)

____ Lòt opsyon (silvouplè spesifye) _____

12. Si ou te soumèt yon pwopozisyon oubyen mande yon modifikasyon oswa apwobasyon pou yon vant a pèrt lan men konpayi ipotèk la, konbyen tan sa te pran pou ke konpayi ipotèk la pran yon desizyon e ba ou yon repons?

____ Yon mwa

____ De mwa

____ Twa mwa

____ Kat mwa oubyen plis

____ Konpayi ipotèk la pa janm ban m repons

____ Sa pa aplikab – Mwen pa t mande modifikasyon/apwobasyon pou vant a pèrt

13. Èske ou gen yon avoka k ap reprezante w lan ka sezi ipotekè sa a?

____ Wi        ____ Non  (si se non, silvouplè ale lan kesyon 14)

13a.  Si se wi, kilè ou te pran avoka w la? (chwazi opsyon ki pi koresponn ak lè ou te
      pran avoka a)

_____ Lè mwen te aprann yo t ap fè sezi ipotekè a

_____ Aprè yo te fin fikse dat pou lavant pwopriyete a

14. Èske yon avoka k reprezante konpayi ipotèk la te kontakte w oswa ba w siydevi?

_____ Wi        _____ Non

15. Èske ou te kontakte oswa eseye kontakte avoka ki reprezante konpayi ipotèk ou an?

_____ Wi        _____ Non

16. Si sa aplikab, lan ki pwogram ki gen rapò ak afè sezi ipotekè ke jij la te òdone w
    patisipe?

_____ Reyinyon ak konpayi ipotèk la avèk yon twazyèm pati kòm medyatè enpasyèl
      anpèsòn

_____ Konferans alamyab ak moun ki bay prè a (lan telefòn oswa anpèsòn) san pa gen
      yon moun enpasyèl pou fasilite konvèsasyon an.

17. Sitoutfwa jij la ta kreye okazyon pou w pran kontak dirèk ak konpayi ipotèk ou an pou
    diskite opsyon ke w genyen san ke w pa gen pou w depanse okenn frè alavans, èske ou
    ta vle fè sa?     _____ Wi        _____ Non

18. Èske yo te fè okenn seyans lan tribinal konsènan prè w la?    _____ Wi        _____ Non
    (si se non, silvouplè ale lan kesyon 19)

    **Si se wi:**
    18a.  Kijan jij la te trete w pandan seyans lan(yo)?  (tyeke youn)

        _____ Trè byen
        _____ Byen
        _____ Ni byen ni mal
        _____ Mal
        _____ Trè mal

18b.  Èske yo te ba w chans pou w te prezante oswa eksplike enfòmasyon konsènan ka w la?

_____ Wi            _____ Non

18c.  Èske yo te ba w chans pou w te poze kesyon?

_____ Wi            _____ Non

18d.  Èske jij la te trete w avèk respè pandan seyans lan tribinal la?

_____ Wi       _____ Non

18e.  Èske anplwaye yo te trete w avèk respè lè w te lan tribinal la (oswa lan palè jistis la)?

_____ Wi       _____ Non

18f.  Kijan avoka konpayi ipotèk la te trete w pandan w te lan seyans tribinal la(yo)?
(tyeke youn)

____ Trè byen

____ Byen

____ Ni byen ni mal

____ Mal

____ Trè mal

19.  Èske jij la te pran yon desizyon  lan ka sezi ipotekè w la?

____ Wi       ____ Non       ____ M pa konnen

20.  Apade ipotèk prensipal ou an, èske ou dwe okenn lòt prè oswa obligasyon sou kay ou an?              _____ Wi       _____ Non   (si se non, ale lan Q. 21)

**Si se wi:**

20a.  Silvouplè tyeke tout sa ki aplikab:

____ Dezyèm ipotèk

_____ Liy dekredi sou valè nèt kay la (HELOC)

_____ Lòt opsyon

21. Èske gen plis ke yon ka sezi ipotekè ki prezante sou pwopriyete sa a?

_____ Wi          _____ Non

22. Si sa aplikab, èske kotizasyon pou kondominyòm ou an oswa pou asosyasyon pwopriyetè yo peye kounyeya e yo ajou?

_____ Wi          _____ Non          _____ Pa aplikab

23. Èske ou rete kounyeya lan yon kay ki sou sezi ipotekè ?

_____ Wi          _____ Non

24. Èske ou dwe plis lajan sou kay ou an ke valè li sou mache imobilye aktyèl la?

_____ Wi          _____ Non

25. Èske ou te achte pwopriyete sa a kòm envestisman?   _____ Wi          _____ Non

26. Èske ou te an kontak avèk konpayi ipotèk la men yo pa t kapab di w ki desizyon y ap pran sou ka w la? _____ Wi   _____ Non

**Silvouplè tyeke Vre oubyen Pa Vre pou chak deklarasyon suivan yo, baze sou sa w konnen/kwè osijède pwosesis sezi ipotekè a.**

27. ___ Vre ___ Pa vre      Ou pral pèdi kay ou.

28. ___ Vre    ___ Pa vre     Ou gen dwa pou w fè yon aranjman ak konpayi ipotèk la pou w eseye rezoud pwoblèm lan.

29. ___ Vre    ___ Pa vre     Yo ka pran yon jijman monetè kont ou si montan ki sot lan vant kay ou an selon jan jij la  te òdone a mwens ke montan prè w la.

30. ___ Vre ____ Pa vre     Ou ka gen dwa pou w resevwa lajan si montan ki sot lan vant kay ou an selon jan jij la te òdone a plis ke montan prè w la.

31. ___ Vre    ___ Pa vre     Ou gen dwa pou w prezante yon repons (reyaksyon) bay jij la sou sezi ipotekè a.

32. ___ Vre   ___ Pa vre    Gen konsèy a ba pri sou afè sezi ipotekè ki disponib pou ede w eseye rezoud  ka sezi ipotekè w la.

33. ___ Vre ___ Pa vre    Ou konprann ki kalite aranjman ki ka disponib lan ka sezi ipotekè w la.

34. ___ Vre ___ Pa vre    Ou fèt pou w soti lan kay la osito ke yo prezante ka sezi ipotekè a.

35. ___ Vre ___ Pa vre    Ou fèt pou w soti lan kay la lè ou resevwa yon lòd jij la ki di fòk ou jete w.

36. ___ Vre   ___ Pa vre    Lè kay ou sou sezi ipotekè, ou pa bezwen peye kotizasyon pou kondominyòm oswa asosyasyon pwopriyetè yo.

37. ___ Vre   ___ Pa vre    Infwake yo prezante jijman pou sezi ipotekè a, kay la pa pou ou ankò.  Li vin responsabilite konpayi ipotèk la.

Mèsi pou patisipasyon w lan ankèt sa a.

Si w gen kòmantè oswa si jesyon siplemantè, silvouplè voye yo lan:
The Mortgage Foreclosure Task Force lan DRCmail@flcourts.org , oubyen
c/o The Dispute Resolution Center, 500 S. Duval St., Tallahassee, FL  32399-1905

ATTORNEY SURVEY

# Florida Supreme Court Task Force on Residential Mortgage Foreclosures

In response to the mortgage foreclosure crisis in Florida, the Florida Supreme Court has formed the Task Force on Residential Mortgage Foreclosures to recommend policies, procedures, strategies, and methods for easing the backlog of pending residential mortgage foreclosure cases while protecting the rights of parties. Our first task is to identify and describe the experiences of borrowers, lenders, and their attorneys in Florida's foreclosure process. Please provide information to the Task Force about your experience <u>as an attorney</u> by completing the following survey. All responses are <u>anonymous</u> and will be reported only in the aggregate; no answers will be singled out or reported in any way that would allow identification of survey participants. Survey responses are public records, which must be disclosed upon request.

## Survey for Florida Attorneys

PLEASE NOTE: We are interested in your responses as an overall reflection of your practice in Florida. You may leave blank any question to which you don't know the answer or to which you are not comfortable giving an answer.

1. **In what circuits do you practice? (check <u>all circuits</u> in which you do significant work)**

   ____ 1st circuit      ____ 11th circuit
   ____ 2nd circuit      ____ 12th circuit
   ____ 3rd circuit      ____ 13th circuit
   ____ 4th circuit      ____ 14th circuit
   ____ 5th circuit      ____ 15th circuit
   ____ 6th circuit      ____ 16th circuit
   ____ 7th circuit      ____ 17th circuit
   ____ 8th circuit      ____ 18th circuit
   ____ 9th circuit      ____ 19th circuit
   ____ 10th circuit      ____ 20th circuit

2. Who do you <u>primarily</u> represent in residential mortgage cases? (select one)
   a. Plaintiff (lenders/servicers)
   b. Defense (borrowers/tenants)
   c. Other (condo associations; HOAs; junior lienholders)

3. How many residential foreclosure cases do you currently have pending in the State of Florida?  #_____

4. In what percentage of your foreclosure cases has the note been transferred?
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

5. In what percentage of your foreclosure cases is the documentation of note, mortgage, assignments, etc. , produced by or at the time of the final hearing?
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

6. In what percentage of your foreclosure cases, if you know, is the property "owner occupied" ?
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

7. What percentage of your foreclosure cases involves tenants?
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

8. What percent of your foreclosure cases are based upon mortgage loans that are securitized?
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

9. To the best of your knowledge, what percentage of foreclosure cases default for each of the following reasons? (If you don't know the reasons for default, please answer "no" to question 9f below and leave other questions blank.)

   a. Interest rate resets
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

   b. Loss of employment
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

   c. Other change in borrower financial condition
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

   d. Decline in home values (walkaways)
   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

   e. Not realistically repayable from the outset

0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

f. Please check "no" below if you <u>don't know</u> the reasons for defaults in mortgage loans ____ yes ____ No

10. If you represent lenders/servicers, in what ways do you communicate with borrowers? (please check all that apply)
____ Telephone messages/voicemail
____ US Mail
____ Email
____ "Live" call from mortgage holder employee
____ Other

11. If you represent borrowers, what communications do your clients receive before foreclosure is filed? (please check all that apply)
____ Telephone messages/voicemail
____ US Mail
____ Email
____ "Live" call from mortgage holder employee
____ Other

12. Is it your practice to refer borrowers for financial or foreclosure counseling?
_____yes    _____no

13. Do you know how to find a HUD certified financial counselor or a certified foreclosure counselor for your clients?
_____yes    _____no

14. For Borrower's lawyers : When you attempt to contact the plaintiff, how often (what % of the time) do you have the following communications?

a. You get recorded messages containing information about your client's mortgage status
0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

b. You get voice mail and are asked to leave a message
0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

c. "Live" interaction with loss mitigation department/home retention strategy staff

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

d. You talk directly with loan holder's lawyers

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

e. You talk to loan holder's lawyers but are referred to loss mitigation/home retention strategy department

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15. Please indicate below how frequently (in what % of cases) each type of mortgage loss mitigation efforts/home retention strategies is used in your cases. If a particular strategy is not used, please indicate "0" percent.

15a. Suggesting borrower talk to housing counseling agency

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15b. Forbearance agreement

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15c. Adding missed payments to loan balance

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15d. Changing interest rate

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15e. Extending mortgage

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15f. Repayment plan

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15g. ARM to fixed rate

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15h. Reduction of the principal

   0%     1-20%     21-40%     41-60%     61-80%     81-99%     100%

15i.  Lump sum payment
  0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

15j.  Managed transition or departure with dignity
  0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

15k.  Partial claim
  0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

15l.  Short sale
  0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

15m.  Assumption of mortgage
  0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

15n.  Deed-in-lieu of foreclosure
  0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

16. Please tell us, to the best of your knowledge, the number of foreclosure cases you are currently handling in which a summary judgment has been entered but the sale date for the property has not yet been set. (# of cases)

   _____

17. Based on your experience, please estimate the percentage of your cases with the following lengths of time elapsed from final judgment to the actual sale.

   17a.  Up to one month:
     0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

   17b.  Two months:
     0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

   17c.  Three months:
     0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

   17d.  Four months:
     0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

17e.  Five months or longer

   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

18. In what percentage of your foreclosure cases has a borrower sought bankruptcy protection?

   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

19. In what percentage of your foreclosure cases do you conduct formal discovery?

   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

20. What information is needed from a borrower to evaluate a potential resolution of a foreclosure case?  (Please check all that apply)

   \_\_\_\_ Employment paystubs
   \_\_\_\_W2's/tax returns
   \_\_\_\_ Hardship letter (proof of hardship)
   \_\_\_\_Financial affidavit/statements
   \_\_\_\_Proof of credit or foreclosure counseling
   \_\_\_\_ Current debt and cash flow

21. To what extent do your clients rely upon the advice of counsel in deciding whether to work out a foreclosure case? (check one)
   \_\_\_\_ Not at all
   \_\_\_\_ Occasionally
   \_\_\_\_ Frequently
   \_\_\_\_ Decisions are made by loss mitigation department of holder

22. (For Plaintiff lawyers) Do you have authority on behalf of the mortgage holder to make loss mitigation decisions?  \_\_\_\_ Yes  \_\_\_\_ No

23. (For Plaintiff lawyers)  In what percent of your securitized cases do you or your trustee-client  have the authority to enter into binding loss mitigation negotiations?

   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

24. (For Plaintiff lawyers) With respect to authority to negotiate loan terms, what percentage of loans that you service are subject to the FNMA and FHMC guidelines for loan modification?

   0%    1-20%    21-40%    41-60%    61-80%    81-99%    100%

25. What are the obstacles to trying to work out a resolution to a foreclosure action? (Please rate the importance of each issue/obstacle using a 1-5 rating scale; 1= less important, 5= more important)

1        2          3          4          5

25a. Cannot locate borrower
25b. Cannot communicate with borrower
25c. Borrower non-responsive
25d. Borrower's attorney delaying action
25e. Cannot communicate with mortgage holder
25f. Plaintiff's counsel refuses to discuss or has not authority
25g. Cannot get through to a person
25h. Mortgage holder refuses to consider reasonable options to settle
25i. Unreasonable delay in responses from Mortgage holder
25j. Plaintiff's attorney is uninformed about status of loss mitigation efforts
25k. Lack of adequate financial information from borrower
25l. Unrealistic expectations of borrower in terms of compromise
25m. Financial inability of borrower to modify
25n. Borrower "underwater"—decline in property value causes loan balance to exceed current property value
25o. Other lienholders (seconds, HELOC's, Condo and HOA's)
25p. Real estate market conditions—excess inventory in geographic area

26. Have you participated in foreclosure mediation as an attorney or mediator?
    _____ Yes _____ No

26a. If yes, how much time do you estimate a typical foreclosure mediation would take?
    1 hour     2 hours     3 hours     4 hours     5 or more hours

27. In your opinion, what is a reasonable hourly rate for a mediator to charge for conducting a typical foreclosure mediation?
    $100/hour     $150/hour   $200/hour   $250/hour   $300 or more/hour
    Other_____

28. If you are not a certified mediator, would you be willing to receive specialized Supreme Court training to become eligible to mediate cases limited to foreclosure issues?          \_\_\_\_ Yes \_\_\_\_ No

29. If you were certified as a Supreme Court foreclosure mediator, would you be willing to mediate a limited number of cases without charge in exchange for receiving a number of paid mediation cases?     \_\_\_\_ yes       \_\_\_\_ no

   29a.  If yes, what ratio of no-fee cases to paying cases would you accept? (please check one)
   \_\_\_\_\_ One no-fee case for each paid case
   \_\_\_\_\_ Two no-fee cases for each paid case
   \_\_\_\_\_ Three no-fee cases for each paid case
   \_\_\_\_\_ Other: please specify_____


If you have additional comments or suggestions, please send your comments to:
The Mortgage Foreclosure Task Force at DRCmail@flcourts.org , or
c/o The Dispute Resolution Center, 500 S. Duval St., Tallahassee, FL  32399-1905